No. 24-6146

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

————————————————————

IEHAB HAWATMEH, as Administrator of the
Estate of Joseph Hawatmeh, et al.,
*Plaintiffs—Appellants,*

*v.*

CITY OF HENDERSON, et al.
*Defendants – Appellees,*

————————————————————

**APPELLANTS' REPLY BRIEF**

————————————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA
Case No. 2:22-cv-01786-APG-DJA

————————————————————

Roger P. Croteau, Esq.
Nevada Bar No. 4958
Timothy E. Rhoda, Esq.
Nevada Bar No. 7878
ROGER P. CROTEAU AND ASSOCIATES, LTD
2810 W. Charleston Blvd. #67
Las Vegas, Nevada 89102
Telephone: (702) 254-7775
Facsimile: (702) 228-7719

Attorneys for Plaintiffs/Appellants

## **CORPORATE DISCLOSURE STATEMENT**

## **PURSUANT TO FED. R. APP. P. 26.1**

The undersigned counsel for Plaintiffs/Appellants, states that the Appellants are all individuals and not corporate entities.  As such, Fed.R.App.P. 26-1 is inapplicable to this matter.  Appellants are represented by Roger P. Croteau and Timothy E. Rhoda of Roger P. Croteau & Associates, Ltd.

## **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT........................................................ ii

TABLE OF AUTHORITIES ................................................................. iv

INTRODUCTION ................................................................. 1

    1.    AT THE VERY LEAST, QUESTIONS OF MATERIAL FACT EXIST REGARDING WHETHER JOSEPH WAS OR WAS NOT A HOSTAGE AT THE TIME OF HIS DEATH ................................ 2

    2.    THE DISTRICT COURT ERRED BY FINDING THAT JOSEPH WAS NOT SEIZED ........................................... 9

    3.    THE DISTRICT COURT ERRED BY FINDING THAT THE OFFICERS WERE ENTITLED TO QUALIFIED IMMUNITY.......11

    4.    THE DISTRICT COURT ERRED BY DISMISSING THE PLAINTIFFS' SUBSTANTIVE DUE PROCESS CLAIMS ........... 14

    5.    THE DISTRICT COURT ERRED BY DISMISSING THE PLAINTIFFS' CLAIMS FOR *MONELL* LIABILITY ................... 18

CONCLUSION ................................................................. 20

CERTIFICATE OF COMPLIANCE .................................................... 21

STATEMENT OF RELATED CASES ................................................. 22

CERTIFICATE OF SERVICE ........................................................ 23

iii

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................................... 1

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955,

167 L. Ed. 2d 929 (2007) ...................................................................... 1

*Brendlin v. California*, 551 U.S. 249, 127 S. Ct. 2400 (2007) ............................ 10

*Brower v. City of Inyo*, 489 U.S. 593 (1989) ........................................... 10

*Chew v. Gates*, 27 F.3d 1432 (9th Cir. 1994) ......................................... 13

*Corrigan v. D.C.*, 841 F.3d 1022 (D.C. Cir. 2016) ................................. 19

*Doe v. Purdue Univ.*, 928 F.3d 652 (7th Cir. 2019) ................................. 1

*Graff v. Corr. Corp. of Am.*, No. 1:14-CV-00249-REB,

2016 WL 1170942 (D. Idaho Mar. 23, 2016) ....................................... 19

*Long v. City and County of Honolulu*, 511 F.3d 901 (9th Cir. 2007) .................. 13

*Malley v. Briggs*, 475 U.S. 335, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986) ... 11, 17

*Monell v. Department of Social Services*, 436 U.S. 658 (1978) ................. 2, 18, 19

*Monzon v. City of Murrieta*, 978 F.3d 1150 (9th Cir. 2020) ................... 8

*Patel v. Kent Sch. Dist.*, 648 F.3d 965 (9th Cir. 2011) ........................... 16

*Plumhoff v. Rickard*, 572 U.S. 765 (2014) ........................................... 7

*Scott v. Henrich*, 39 F.3d 912 (9th Cir. 1994) ....................................... 13

*Tennessee v. Garner*, 471 U.S. 1 (1985) ...................................................... 10, 12, 13

*Terry v. Ohio*, 392 U. S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968) ................... 11

*Villanueva v. California*, 986 F.3d 1158 (9ᵗʰ Cir. 2021) ............................ 5, 10, 14

## **Rules**

Fed. R. Civ. P. 8(a) ................................................................................. 1

Fed.R.App.P. 26-1 ................................................................................ ii

Fed. R. App. P. 32(a)(7)(B)(iii) ............................................................... 21

Fed. R. App. P. 32(a)(7)(c) ..................................................................... 21

Fed. R. App. P. 32(a)(7)(C)(i) ................................................................. 21

## **INTRODUCTION**

As this Court is well aware, for purposes of the Defendants' Motion to Dismiss, the facts alleged in the Plaintiffs' FAC must be accepted as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). Rule 8 only requires "a short and plain statement of the claim" to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Fed. R. Civ. P. 8(a).   The federal rules "do not require a plaintiff to include much factual detail in a complaint." *Doe v. Purdue Univ.*, 928 F.3d 652, 665 (7th Cir. 2019); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (the plaintiff is not required to make "detailed factual allegations"). Dismissal is appropriate only if the complaint lacks "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The Defendants assert that Joseph was a hostage and never ceased being a hostage.  As the Defendants acknowledge in their Answering Brief, whether Joseph ever ceased being a hostage is "especially relevant" to Plaintiff's Fourth Amendment claims, as well as the Defendants qualified immunity defense.  Ans.

Brief, p. 12. The Plaintiffs contend that Joseph was no longer a hostage after Bourne was shot and killed. Finding otherwise would necessarily suggest that Bourne constituted a threat to Joseph and others after he was already dead. This is simply not sensible.

The Defendants' remaining arguments are largely linked to whether Joseph was a hostage at the time of his death. The Defendants aver that Joseph was never seized despite the fact that he was shot and killed. They further aver that the Plaintiffs' substantive due process claims fail because the Police Defendants' actions do not shock the conscience, among other reasons. Finally, the Defendants' assert that *Monell* liability does not exist despite the fact that one of the primary investigators of this very shooting - a former employee of HPD – testified at great length regarding the training deficiencies of the Defendants.

## ARGUMENT

**1.**  **AT THE VERY LEAST, QUESTIONS OF MATERIAL FACT EXIST REGARDING WHETHER JOSEPH WAS OR WAS NOT A HOSTAGE AT THE TIME OF HIS DEATH**

Plaintiffs' allegation that Joseph was alive and well after Pendleton's shot, but that he was shot and killed during the subsequent volley of contagious gunfire,

is well documented by the facts alleged in the FAC. [2-ER-211]. Specifically, the

FAC alleges as follows:

> At 11:24:36, a single gunshot was fired by Pendleton which, upon
> information and belief, **struck and killed Bourne**. Based upon the
> transcript of the Bourne 911 Call, after the Pendleton shot at 11:24:36
> a.m., **no audible shots were fired inside the Escalade**. However,
> immediately thereafter, contagious gunfire erupted from various other
> officers at 11:24:38, riddling the Escalade with bullets and, upon
> information and belief, striking and killing Joseph. During and
> immediately after the contagious gunfire, Smith was yelling "Stop"
> and to "ceasefire." The contagious gunfire was a direct and proximate
> result of Smith's failure to advise the HPD officers other than
> Pendleton that she had ordered him to take a lethal shot.

*Id*. at ¶158 (Emphasis added). Clearly, the FAC alleges that Bourne was shot and

killed by Pendleton. The FAC further alleges that only immediately thereafter was

Joseph shot and killed by the Police Defendants. *Id*. Plaintiffs allege that in the

intervening time period, Joseph was rendered no longer a hostage quite simply

because the hostage-taker was rendered dead.

The FAC further alleges that Pendleton, who had an unobstructed view of

Bourne as he prepared to take his shot, never saw any indication that Bourne had

fired his weapon. [2-ER-211]. Specifically, Pendleton never saw Bourne shoot;

never saw Bourne raise his gun; and never saw any muzzle flash indicating that

Bourne had fired his weapon inside the vehicle. *Id*. at ¶159. This was all the case

despite the fact that Pendleton was looking through the sights of his weapon and

was singularly focused upon Bourne.  Had any of these things happened, Pendleton almost certainly would have seen them occur.

Contrary to the allegations of the Defendants, the FAC clearly asserts that Joseph was alive and well at the time Pendleton took the shot that is alleged to have killed Bourne.  To the extent that any doubt exists, the FAC goes on to allege that "[u]pon information and belief, Joseph was shot in the volley of contagious gunfire that followed Pendleton's single shot at Bourne" and that "[p]ursuant to the Bourne 911 Call transcript, Joseph was alive and screaming after the Pendleton shot, but was mortally injured after the first volley of shots." [2-ER-212] at ¶161-162.  Pursuant to the allegations of the FAC, Joseph was shot by the Police Defendants only after Bourne had been shot and killed.

Immediately after Pendleton took his shot as directed by Sergeant Smith, the other seven officers opened fire. [2-ER-211].  As described above, this occurred only after Bourne is alleged to have been shot and killed.  As the other seven officers were indiscriminately and randomly shooting at the Escalade, Sergeant Smith immediately began yelling "STOP! STOP! STOP!" and "Cease fire." [2-ER-212] at ¶163-164.  Thereafter, when asked after the shooting concluded whether she was okay, Sergeant Smith, exclaimed "No! We took a fucking head shot and you have open fire from behind." [2-ER-213] at ¶176.  Sergeant Smith

further exclaimed "he put the gun up to kid and we shot him. And then everyone fired!" *Id*. at ¶177. Clearly, based upon her own excited utterances, Sergeant Smith believed that Bourne had been taken out with a "head shot" and that he was no longer a danger at the time that the remaining seven officers recklessly and unnecessarily opened fire on the Escalade. As such, the allegations of the FAC clearly support the Plaintiffs' claim that Joseph was no longer a hostage at the time that he was shot and killed by the police.

Because Joseph was no longer a hostage and therefore no longer in danger, the District Court's Order is erroneous and the Defendants' arguments and the majority of the cases which they cite in support thereof are misplaced. In fact, the recent matter of *Villanueva v. California*, 986 F.3d 1158 (9th Cir. 2021), which the Defendants attempt to distinguish as a non-hostage situation, is highly applicable to this matter. As the Defendants point out, the *Villanueva* court found that an innocent passenger who was not intentionally targeted by police <u>was</u> seized for Fourth Amendment purposes when officers used intentional force to stop a vehicle. *Villanueva*, 968 F.3d at 1167. Such is the situation at hand, where at the time of his death, Joseph was no longer a hostage but simply an innocent passenger in the vehicle which the police intentionally fired upon. The police officers knew that Joseph was inches from Bourne in the Escalade with the

windows up and would have to conclude that Joseph would very likely be hit by their erratic and random shooting. Nonetheless, they fired with reckless abandon after Bourne is alleged to have already been dead.

The Defendants object to the Court making assumptions in favor of the Plaintiff's arguments while simultaneously asking the Court to make assumptions in their favor. What is known is that Pendleton took his shot without having witnessed Bourne take any shot. Pendleton's deposition testimony is cited verbatim in the FAC as follows:

> Officer Pendleton participated in a videotaped deposition in this case on August 25, 2023. During his deposition, Pendleton confirmed that he had an unobstructed view of Bourne prior to the time that he took his shot. When asked "Did you see him shoot anything at any point in time?," Pendleton responded "I did not." When asked "Did you see him raise his gun at any point in time?," Pendleton responded "I did not." When asked "And you saw no flash inside the car, you saw no evidence of anything that at least would appear to you that shots were emanating inside the vehicle?," Pendleton responded "I didn't see anything, no." When asked "In the midst of having all these officers around the vehicle, you personally never saw Bourne threaten the officers? In other words, outside the vehicle pointing a gun through the windshield or whatever in any way?," Pendelton responded "Correct, I did not."

[2-ER-211]. It is not necessary or appropriate to make assumptions regarding whether Pendleton's testimony is factually accurate at this stage. The Plaintiffs are aware of no reason to doubt the veracity or accuracy of Pendleton's testimony.

It is alleged in the FAC and must have been presumed to be true for purposes of the Motion to Dismiss. Pendleton's testimony evidences that he shot and killed Bourne before Bourne had the opportunity to shoot Jospeh. Only thereafter did the remaining Police Defendants negligently and unnecessarily fire upon the Escalade, shooting Joseph numerous times and killing him.

The Defendants assert that even if Bourne was shot and killed first, Joseph was, as a matter of law, still a hostage at the time of his death. This argument suggests that a corpse can take and hold hostages. Contrary to the Defendants' arguments, neither this Court nor the Supreme Court has condoned the haphazard and negligent shooting of innocent children.

The Defendants cite the matter of *Plumhoff v. Rickard*, 572 U.S. 765 (2014) for the seeming proposition that "police officers may continue shooting until the threat has ended." As stated above, the risk presented by Bourne was negated as soon as Pendleton shot and killed him. Moreover, *Plumhoff* involved "outrageously reckless driving" and a police chase which exceeded 100 miles per hour, and included the passing of more than two dozen other motorists. *Plumhoff*, 572 U.S. at 766, 134 S. Ct. at 2015. The Court categorized the chase as a "grave public safety risk." *Id*. Moreover, "the record conclusively disprov[ed] that the chase was over when Rickard's car came to a temporary standstill and officers

Page 7 of 23

began shooting." *Id*. This is a far cry from the instant situation where Bourne had been shot and killed, the Escalade was stationary and had not moved one inch, and was boxed in by numerous police vehicles and police personnel.

Similarly, the matter of *Monzon v. City of Murrieta*, 978 F.3d 1150 (9th Cir. 2020), involved a high speed chase that ended with the driver utilizing his vehicle as a weapon against the police. Monzon led the officers on a high-speed chase, reaching speeds of up to 100 mph, and then, while in close quarters, steered the van in the direction of and among officers on foot, before crashing the van into a police car. *Monzon*, 978 F.3d at 1163. As the vehicle accelerated towards them, the police fired seventeen shots at the vehicle in the span of approximately 5 seconds. *Id*. at 1155. This Court held that the "officers' use of deadly force was objectively reasonable in this dynamic and urgent situation, where officers were faced with the immediate threat of significant physical harm." *Id*., at 1154. Again, this is not a similar situation to the instant matter.

In this case, Sergeant Smith had directed one officer, Pendleton, to take a shot to attempt to kill Bourne. According to the allegations of the FAC, Pendleton did exactly that. The Police Defendants were in no danger whatsoever and there was no need for them to haphazardly fire their weapons at the Escalade after

Bourne was already dead or incapacitated. Nor was Joseph in any danger since Bourne is alleged to have been already deceased.

The Defendants assert that Plaintiffs argue that the "HPD Defendants should have instantaneously recognized Bourne's death and ceased firing immediately in less than two seconds" Ans Brief, p. 21. However, this suggests that all of the Police Defendants were firing when Bourne was shot and killed. They were not. On the contrary, as stated above, Sergeant Smith had directed Pendleton and Pendleton alone to take a shot. No other officer was directed to do so. Only after Pendleton took his sole shot that is alleged to have killed or incapacitated Bourne did the other officers **start** shooting. At the very best, the conduct of the Police Defendants other than Pendleton was patently unreasonable and grossly negligent.

## 2.    **THE DISTRICT COURT ERRED BY FINDING THAT JOSEPH WAS NOT SEIZED**

As discussed at length in the Opening Brief, Joseph was seized both before and when he was shot by the police. Initially, the Police Defendants surrounded the Escalade and made it very clear that it could not depart the scene. Thereafter, the Police Defendants shot and killed Joseph, making it completely impossible for him to leave the scene.

The Defendants attempt to distinguish *Brendlin* and *Villanueva*, asserting that the instant matter did not involve a "traffic stop." Ans. Brief, p. 27. While it is true that Bourne was not driving the Escalade and had committed no moving violations, this is a disingenuous and meaningless distinction. A seizure by control or show of authority requires that "a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result." *Brower v. City of Inyo*, 489 U. S. 593, 599, 109 S. Ct. 1378, 103 L. Ed. 2d 628 (1989). In this case, the purpose of the police in surrounding the Escalade was to ensure that neither it nor its occupants left the scene. This was decidedly accomplished as there was no possible way for the Escalade to leave the scene. [2-ER-187-188, ¶102-107]. As a result, as an occupant of the Escalade, Joseph was seized. This fact is further demonstrated by the fact that the Police Defendants instructed both Bourne and Joseph to put their hands up and exit the Escalade. [2-ER-209, ¶130].

Joseph was again seized when, upon information and belief, he was shot by the police. The United States Supreme Court has reasoned that "[w]henever an officer restrains the freedom of a person to walk away, he has seized that person." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). The "seizure" of a "person," can take the form of "physical force" or a "show of authority" that "in some way restrain[s]

the liberty" of the person. *Terry v. Ohio*, 392 U. S. 1, 19, n. 16, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). When the police shot Joseph, they seized his person.

The Defendants argue that the Police Defendants were shooting at Bourne and not the Escalade. Ans. Brief, p. 38. This claim also is contradicted by the FAC, which alleges "[a]fter Pendleton's lethal shot, Bourne was no longer a threat to HPD personnel nor Joseph, yet HPD personnel nonetheless fired 27 more rounds into the Escalade." [2-ER-216] at ¶192. Indeed, the Police Defendants made veritable swiss cheese of the Escalade, spraying it with bullets with reckless abandon. If the Police Defendants were in fact shooting only at Bourne, one would expect the bullets to have been localized around the driver's area of the Escalade. They were not. On the contrary, bullets permeated almost every part of the Escalade.

## 3.   THE DISTRICT COURT ERRED BY FINDING THAT THE OFFICERS WERE ENTITLED TO QUALIFIED IMMUNITY

The United States Supreme Court has stated that qualified immunity insulates from liability "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986). As discussed above, the Plaintiffs assert that the Defendants were plainly incompetent in various respects. Specifically, the Police Defendants are

alleged to have sprayed the Escalade with dozens of bullets with reckless and callous disregard for the safety of Joseph. This occurred only after Pendleton is alleged to have shot and killed Bourne.

The incompetence of the Police Defendants in this case can hardly be overstated. Raymond Wilkins testified at length regarding the conduct of the Police Defendants. Specifically, as alleged in the FAC, with regard to Officer Amezcua, Mr. Wilkins testified that "I've never seen anything more egregious in my life how he took – he took Joseph's hands into – Joseph's life into his own hands and fired wildly with that handgun of his from just about 30 yards away multiple times, and it was – it is – we are not trained to do that as well." [2-ER-224] at ¶233. Mr. Wilkins went on to testify that "[t]his is the most dangerous thing I've – I've seen in law enforcement probably in my entire career." *Id.* at ¶234. With regard to Officer Hehn, Mr. Wilkins testified that Hehn "just ran up and fired negligently at – in Bourne's direction. And then he just – he sort of just ran off." [2-ER-224] at ¶232.

At its heart, the FAC alleges that the Defendants shot Joseph dead at a time when he was **not** a hostage. The FAC is clear in this regard as set forth above. It is well established (and was at the time of the shooting) that a police officer may not seize an unarmed, nondangerous suspect by shooting him dead. *Tennessee v.*

*Garner*, 471 U.S. 1, 11 (1985). This is exactly what the Defendants are alleged to have done in this case. Similarly, "[a]n officer's use of deadly force is reasonable only if 'the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'" *Scott v. Henrich*, 39 F.3d 912, 914 (9th Cir. 1994) (quoting *Tennessee v. Garner*, 471 U.S. 1, 3 (1985)); *Chew v. Gates*, 27 F.3d 1432, 1452 (9th Cir. 1994) (same); *Long v. City and County of Honolulu*, 511 F.3d 901, 906 (9th Cir. 2007).

In this case, the FAC alleges that the Defendants fired dozens of bullets at the Escalade at a time when Bourne was already dead. Joseph was the only remaining living occupant of the Escalade at that time. There is no dispute that Joseph was unarmed and that he presented no threat whatsoever to the police or the public at large. Nonetheless, the Defendants allegedly shot and killed him.

Again, the key allegation which the Defendants repeatedly attempt to brush over is that Pendleton shot and killed Bourne before the remaining Police Defendants recklessly fired dozens of bullets at the Escalade. There was no cause for them to fire at the Escalade and Joseph when Bourne was already dead. This was not the hostage situation that the Defendants repeatedly attempt to portray. The hostage situation had ended by the time the police action complained of took place. When the Police Defendants other than Pendleton opened fire on the

Escalade, they were firing not upon a hostage-taker but upon an innocent child who was unarmed and who had committed no crime whatsoever. Contrary to the Defendants' claims, *Villanueva* is highly analogous to the instant action.

**4.** **THE DISTRICT COURT ERRED BY DISMISSING THE PLAINTIFFS' SUBSTANTIVE DUE PROCESS CLAIMS**

In this case, the District Court found the deliberate indifference test to be inapplicable and therefore determined that the Plaintiffs must satisfy the intent to harm test to plead a plausible claim for violation of their substantive due process rights. [1–ER-014]. This determination was made based upon the Court's finding that the circumstances constituted a fast moving scene "demanding decisions made in haste, under pressure, and without the luxury of a second chance." [1–ER–015]. However, this determination was contrary to the allegations of the FAC and the testimony of HPD's investigator.

As discussed at length in the Opening Brief, Raymond Wilkins was a member of HPD's Critical Incident Review Unit at the time of the shooting. Mr. Wilkins investigated the shooting on behalf of HPD and found the officers and the department to be deficient in numerous respects. [2-ER-194 through 249]. Most importantly, based upon his investigation of this very shooting and his professional experience, Mr. Wilkins testified that – contrary to the determination

of the District Court – the situation was not a fast moving scene. Specifically, the

FAC alleges as follows, citing Mr. Wilkins' deposition testimony:

> Mr. Wilkins further testified that the scene was NOT a fast-moving scene. When asked "How do you answer this? It was a fast-moving scene, and, therefore, we didn't have time to think or deliberate and to wait for SWAT," he replied "It wasn't a fast-moving scene." When asked "Why not?," he responded "Because it was – it was isolated. That car wasn't moving. The subject wasn't out of the car moving around. They had everything contained. I don't – I don't understand the 'fast moving.'"

and

> Mr. Wilkins further elaborated on why the scene was not "fast-moving," stating "That shot shouldn't have been taken. And, clearly, that's – as a use-of-force expert for the Henderson Police Department during the time of 2019 until the last date that I had – I had been at work at February 9th of 2023, I've reviewed, like I've said, thousands of use-or-force events and over, you know, 20 shootings or whatever the number is like that. And based on all of the training that I've received and my personal experience of being involved in shootings not just with – as a police officer, but as the military, as well, having to follow rules – you know, our policy and procedures, but also rules of engagement with the military, everything that I've taken into my life and applying it to this – to this specific case right here, and, you know, coupling that with what we are trained as police officers for the Henderson Police Department, this absolutely was not a fast-moving scene. This right here was self-induced stress."

[2-ER-221 through 222] at ¶222-223. Mr. Wilkins – unlike the District Court – is

an expert in these matters. Moreover, he investigated the shooting and thus

developed significant personal knowledge. Based upon his investigation and

professional experience, Mr. Wilkins determined that the situation was not fast moving and that deliberation was practical. At the very least questions of fact exist regarding whether the Defendants had adequate opportunity to deliberate.

The FAC alleges, based upon the testimony of Mr. Wilkins – a former HPD employee who investigated the subject shooting, that the scenario was not fast-moving and that deliberation was practical. Under such circumstances, the District Court erred by not applying the deliberate indifference standard.

As discussed above and in the Opening Brief, the Defendants sprayed the Escalade with bullets after Bourne is alleged to have been shot and killed. Contrary to the suggestions of the Defendants, the Police Defendants other than Pendleton did not have their sights trained upon Bourne. On the contrary, after Pendleton is alleged to shot and killed Bourne, the remaining Police Defendants randomly and haphazardly fired dozens of bullets into the Escalade, striking all parts of its and ultimately Joseph.

The Defendants knew or should have known that Joseph would likely be struck by the bullets that they randomly and haphazardly fired into the Escalade. Under such circumstances, the Defendants "disregarded a known or obvious consequence of [their] actions." *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 974 (9th Cir. 2011).

The Defendants aver that the Defendants' actions do not shock the conscience. The Plaintiff contend that a jury would find otherwise. The Defendants negligently and carelessly sprayed the Escalade with dozens of bullets after Bourne is alleged to have been already shot and killed. The Defendants were aware that an innocent child was in the Escalade with Bourne. Nonetheless, in their seeming zeal to fire their weapons, they shot nearly every part of the Escalade.

Had the Police Defendants other than Pendleton carefully aimed at Bourne and fired their weapons simultaneously, the fact scenario would be substantially different. However, that is not what happened. After Pendleton alone was directed to take a shot, and took that shot, the remaining Defendants negligently and carelessly sprayed the Escalade with bullets, shooting an innocent child multiple times. There was no need for the careless contagious gunfire as Bourne was allegedly already dead. Only due to the indifference of the Police Officers to Joseph's safety was he shot and killed. This is extraordinarily shocking to the conscience.

As discussed above, qualified immunity insulates from liability "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986). Plaintiff submit that

the actions of the Defendants, other than perhaps Pendleton, were plainly

incompetent.  The Police Defendants other than Pendleton seem to have fired their

weapons simply for the sake of firing their weapons, gratuitously firing generally

in the direction of the Escalade and striking all parts of it.  During this plainly

incompetent round of firing, Joseph was needlessly shot and killed.  Qualified

immunity is not applicable to these plainly incompetent actions.

## 5.  THE DISTRICT COURT ERRED BY DISMISSING THE PLAINTIFFS' CLAIMS FOR *MONELL* LIABILITY

Based upon its determination that the Plaintiffs failed to plausibly allege a

federal constitutional violation, the District Court also dismissed the Plaintiffs'

claims against the City for *Monell* liability.  As discussed in the Opening Brief and

above, this conclusion was erroneous.

Contrary to the Defendants' arguments, the FAC alleges numerous training

deficiencies on the part of the City and HPD.  The Plaintiffs specifically alleged

that HPD and the COH, and each of them, failed to properly train or modify the

training of the Police Defendants and its other officers in matters including, but

not limited to the reasonable and appropriate use of force during attempted arrests

and intervention in the excessive use of force by fellow officers as well as

reasonable police customs, policies, procedures and practices in hostage taking

situations. [2-ER-229-230, ¶263-265]. Mr. Wilkins, a former HPD officer who actually investigated the incident has confirmed this to be the case. Indeed, the "After Action Report" prepared by HPD subsequent to the incident states that the Police Defendants had little or no training regarding vehicle assault and hostage rescue and that this needs to be addressed. [2-ER-230, ¶266]. Mr. Wilkins also specifically identified HPD's failure to train on HPD's barricade and deceleration policies on point in this case. *Id*.

Demonstrating that a police department "had a custom, policy, or practice that caused a constitutional violation" is a "fact-intensive inquiry." *Corrigan v. D.C.*, 841 F.3d 1022, 1039 (D.C. Cir. 2016); *see also Graff v. Corr. Corp. of Am.*, No. 1:14-CV-00249-REB, 2016 WL 1170942, at *13 (D. Idaho Mar. 23, 2016) (noting the "fact-intensive nature of *Monell* claims"). In this case, the Plaintiffs were denied the ability to complete discovery. Under such circumstances, the District Court erred by dismissing Plaintiffs' *Monell* claims despite significant evidence of customs, polices and practices that resulted in constitutional violations because dismissal deprived the Plaintiffs of the opportunity to conduct discovery.

## **CONCLUSION**

For the reasons set forth herein, the district court erred.  Appellants respectfully requests that this Court reverse the district court's order and remand for further proceedings consistent with its order.

DATED this _____10th_____ day of June, 2025.

ROGER P. CROTEAU & ASSOCIATES, LTD.


*/s/ Timothy E. Rhoda*
ROGER P. CROTEAU, ESQ.
Nevada Bar No. 4958
TIMOTHY E. RHODA, ESQ.
Nevada Bar No. 7878
2810 W. Charleston Blvd. #67
Las Vegas, Nevada 89102
(702) 254-7775
***Attorney for Appellants***

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(c), the undersigned certifies the attached opening brief is proportionally spaced, using a 14 point typeface and–excluding the exempted portions as provided in Fed. R. App. P. 32(a)(7)(B)(iii)–contains 4552 words. Pursuant to Fed. R. App. P. 32(a)(7)(C)(I), the undersigned has relied upon the word count of the wordprocessing system used to prepare the attached brief.

DATED this _____10th_____ day of June, 2025.

ROGER P. CROTEAU & ASSOCIATES, LTD.

/s/ Timothy E. Rhoda
ROGER P. CROTEAU, ESQ.
Nevada Bar No. 4958
TIMOTHY E. RHODA, ESQ.
Nevada Bar No. 7878
2810 W. Charleston Blvd. #67
Las Vegas, Nevada 89102
(702) 254-7775
***Attorney for Appellants***

## STATEMENT OF RELATED CASES

Appellants are unaware of any cases that would constitute related cases.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on June 10, 2025. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Timothy E. Rhoda*
An employee or agent of ROGER P. CROTEAU & ASSOCIATES, LTD.