**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| IEHAB HAWATMEH, as Administrator of the Estate of Joseph Hawatmeh; YASMEEN HAWATMEH; LAYTH HAWATMEH, | No. 24-6146 D.C. No. 2:22-cv-01786-APG-DJA |
| *Plaintiffs - Appellants*, | |
| v. | OPINION |
| CITY OF HENDERSON; HENDERSON POLICE DEPARTMENT; THOMAS CHIELLO; JAIME SMITH, FKA Jaime Clear; SETH VAN BEVEREN; BRETT ANDERSON; JESSE HEHN; JESSE LUJAN; JAMES PENDLETON; LUIS AMEZCUA; PHILIP DUFFY; SETH PRICE; THEDRICK ANDRES, | |
| *Defendants - Appellees*. | |

Appeal from the United States District Court
for the District of Nevada
Andrew P. Gordon, Chief District Judge, Presiding

2                HAWATMEH V. CITYOF HENDERSON

Argued and Submitted October 8, 2025
Las Vegas, Nevada

Filed November 7, 2025

Before: Mark J. Bennett, Gabriel P. Sanchez, and Holly A.
Thomas, Circuit Judges.

Opinion by Judge H.A. Thomas

## SUMMARY[*]

### Civil Rights

The panel affirmed the district court's dismissal of a 42
U.S.C. § 1983 action against the City of Henderson, its
police department, and several police officers arising from
the shooting death of 12-year-old Joseph Hawatmeh, who
officers attempted to rescue from a man who had killed
Joseph's mother and housekeeper, gravely wounded his
sister, and was holding him hostage.

The panel held that the officers did not violate Joseph's
Fourth Amendment right to be free of excessive force. The
officers did not seize Joseph for Fourth Amendment
purposes when they employed control tactics or force in an
attempt to rescue him from an active hostage
situation. Moreover, even had plaintiffs plausibly alleged a
constitutional violation, the officers would be entitled to

---

[*] This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

qualified immunity because Joseph's right to be free of excessive force during an active hostage situation was not clearly established at the time of the violation.

The panel held that officers did not violate Iehab Hawatmeh's Fourteenth Amendment liberty interest in the companionship and society of his son. The officers were forced to make "a split-second decision" in a rapidly evolving situation, and therefore, the deliberate indifference standard did not apply. And no factual allegation indicated that the officers had anything but legitimate law enforcement objectives in mind when they fired their guns. Moreover, even if the deliberate indifference standard applied, officers were entitled to qualified immunity because plaintiffs failed to plausibly allege that Iehab's Fourteenth Amendment right was clearly established at the time of the alleged violation.

Plaintiffs' *Monell* claim failed in the absence of any plausible allegation of a constitutional violation.

---

**COUNSEL**

Roger P. Croteau (argued) and Timothy E. Rhoda, Roger P. Croteau & Associates Ltd., Las Vegas, California, for Plaintiffs-Appellants.

Craig R. Anderson (argued) and Harry Arnold, Marquis Aurbach, Las Vegas, Nevada, for Defendants-Appellees.

## OPINION

H.A. THOMAS, Circuit Judge:

On November 3, 2020, 12-year-old Joseph Hawatmeh was tragically shot and killed by Henderson Police Department ("HPD") officers as they attempted to rescue him from the man who had killed his mother and his housekeeper, gravely wounded his sister, and who then held him hostage. Plaintiff Iehab Hawatmeh is Joseph's father. Plaintiffs Yasmeen and Layth Hawatmeh are Joseph's siblings. [1] After his death, they—along with Joseph's estate—sued the City of Henderson, HPD, and several HPD officers, alleging a Fourth Amendment excessive force claim under 42 U.S.C. § 1983; a Fourteenth Amendment substantive due process claim under 42 U.S.C. § 1983; a failure to train claim pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978); and several state law claims. The district court dismissed Plaintiffs' federal claims with prejudice. We affirm.

### I.

#### A.

Dianne Hawatmeh and her daughter Yasmeen had just returned to their apartment complex when their neighbor, Jason Neo Bourne, confronted them in the parking lot about a noise complaint Dianne had made about him. [2] The

---

[1] For clarity, all members of the Hawatmeh family are referred to by their first names in this opinion, while all other individuals are referred to by their last names. No disrespect is meant by these designations.

[2] "At the motion to dismiss stage, we must accept all allegations of material fact as true and construe them in the light most favorable to the

conversation ended without incident, and Bourne walked away. But as Dianne and Yasmeen continued to their apartment, Bourne came running after them, causing them to rush to the apartment in fear. Joseph was already inside the apartment. Two housekeepers, Veronica Muniz and a second woman, were also inside the apartment. Dianne and Yasmeen entered the apartment and closed the door but were unable to latch the deadbolt because Bourne was trying to force his way inside. Bourne ultimately kicked the door open, shot Dianne and Muniz to death, and shot and severely wounded Yasmeen.

Bourne then turned to Joseph. He demanded that Joseph tell him the location of the keys to the family's Cadillac Escalade. When neither Joseph nor Yasmeen—then lying on the floor, bleeding—could tell him where the keys were, Bourne again shot Yasmeen multiple times.

At 10:58 a.m., while still inside the Hawatmeh family's apartment, Joseph called 911. Joseph told the HPD operator that "somebody's in [his] apartment with a gun" and gave the operator the name of the apartment complex. During that phone call, Bourne fired his gun twice in the background and told Joseph that he "ha[d] 10 seconds to find the keys." Bourne eventually found the car keys, took Joseph as a hostage, and left the apartment. He dragged Joseph to the Escalade, forced him into the front passenger seat, and sat in the driver's seat.

At or around the same time, HPD received phone calls from Yasmeen, the second housekeeper, and a neighbor. During Yasmeen's 911 call, the HPD dispatcher heard what

---

nonmoving party . . . ." *Salas v. United States*, 116 F.4th 830, 845 (9th Cir. 2024).

6          HAWATMEH V. CITY OF HENDERSON

might have been crying in the background for a few seconds, but the line went quiet shortly thereafter. During the second housekeeper's 911 call, the housekeeper explained that Bourne had kicked in the door to the apartment, and she described him as carrying a gun. During the neighbor's 911 call, the neighbor told the HPD dispatcher that Dianne was bleeding in the doorway of the Hawatmeh apartment and that another neighbor had seen Bourne leave the apartment with a child.

At 11:07 a.m., Bourne called 911 using Joseph's cell phone. Bourne introduced himself as Jason, although he said that he "sometimes think[s] [his] name is XM Satellite Radio" and that he was "Gotham's reckoning, also known as Bane." Bourne explained that he was "from the future." He stated that he and Joseph were "doing a movie," and he introduced his "friend" Joseph to the HPD dispatcher. [3] Bourne informed the dispatcher that he wanted a helicopter, that he had a gun, and that he had taken a hostage.

The HPD dispatcher asked Bourne for his address. Bourne then turned to Joseph for the address and told him,

> I'm not going to hurt you as long as you don't get you[r] address wrong. If you get your address wrong, I have to kill you. You keep looking over your shoulder. You're making me nervous. Is there a cop over there? . . . If

---

[3] Bourne, Joseph, and the HPD dispatcher referred to Joseph as "Jordan" throughout the call.

> you look over that way again, I might have to
> hurt you.

The dispatcher asked to speak with Joseph, at which point
Joseph got on the phone and answered a few of the
dispatcher's questions. Bourne told the dispatcher not to ask
Joseph any more questions but also instructed Joseph to
answer the dispatcher's questions. Bourne then demanded a
"helicopter here in 10 minutes or someone dies."

After Joseph and Bourne gave the HPD dispatcher the
name of the apartment complex, the dispatcher asked for the
apartment number. Bourne stated, "13-301 is the guy I
killed, if that helps you. So, maybe I should kill this guy."
Bourne told Joseph to "do your fake cry," and Joseph said,
"Please don't kill me. Please don't kill me. No. He's got a
gun." Bourne replied,

> Oh. Okay. Okay. You gotta act for real
> though, dude. This is Vegas. This is the land
> of, like, is this a real gun?
> . . .
> Oh, my god. What a rush.
> . . .
> I thought killing a baby would be hard.
> . . .
> So, you guys got 10 minutes to bring my
> helicopter now or I'll (incomprehensible.).

When Joseph told the HPD dispatcher that they "have four
minutes now to get the helicopter," the dispatcher told
Joseph and Bourne that HPD would need more time to obtain
a helicopter. Bourne then replied, "Well, I'm gonna shoot I
have to, but—." Bourne explained that he and Joseph "gotta

rehearse," muted the phone, unmuted the phone, and stated, "[H]old on. Let—let me get my scripts. Hold on. And it says .40 caliber Smith and Wesson armor-piercing rounds—."

The call between Bourne and the HPD dispatcher lasted roughly 17 minutes. Much of the call was incomprehensible. Bourne warned the dispatcher that "[t]he only thing I want to hear from you is . . . one-word responses from here on out" or else "the kid dies." Bourne stated, "[T]ake control of your city, and Jordan will not die[.]" Bourne told the HPD dispatcher, "I'm sorry to say, I already—stop fucking—you say one more word, I'mma shoot him in the leg. I swear to god." Joseph repeatedly screamed during the call and asked Bourne not to hurt or shoot him. Bourne told the HPD dispatcher that he had "nano explosives inside of [him]." Bourne also stated that "if any American person dies . . . in the next 24 hours . . . I shoot him like a game." Bourne said that "someone's getting fucking shot" and "I already shot, like, a baby, bro." Bourne asked Joseph, "Who's the finest girl in the world? And if you get it wrong, I have to shoot you." Joseph repeatedly asked Bourne if Bourne could stop pointing the gun at him. Bourne responded, "Nope. Sorry. These are my rules. I don't go by rules." At least twice during the phone call, Bourne indicated that he had not taken his medications. He requested that HPD bring him various celebrities. He threatened Joseph with sexual assault.

In response to multiple 911 calls, HPD officers soon arrived at the apartment complex. The Escalade was parked in front of a wall, and a police officer stationed himself on the opposite side of that wall. At least 16 other HPD officers circled the vehicle, ensuring that the vehicle could not leave the scene. Police vehicles also blocked the parking lot road and the entrance to the apartment complex, preventing all access in or out of the parking lot. Having received

information that a suspect was inside a vehicle threatening
to kill a 12-year-old child, Special Weapons and Tactics
(SWAT) personnel were activated and began traveling to the
address. Bourne did not move the Escalade from the parking
lot at any point and did not attempt to flee.

The HPD dispatcher told Sergeant Jaime Smith that
Joseph "is saying that this man will kill him." Sergeant
Smith shouted at the Escalade, "Let me see your hands, both
of you. Put your hands up, exit the vehicle." Sergeant Smith
announced over the radio that she saw a gun, and that "the
child has his hands up." Sergeant Smith yelled, "Sir, step out
of the vehicle, let's just talk. Let me see your hands sir."

Bourne muted and unmuted the phone again. He told
Joseph, "I have to shoot you . . . ." Bourne and Joseph
continued speaking:

> Bourne: Okay. I need you to open your
> mouth.
> Joseph: No, sir.
> Bourne: Is this gun loaded?
> Joseph: Yeah.
> Bourne: Do you think it is or should we test
> it out?
> Joseph: No. We shouldn't test it out.

Bourne told Joseph that "[t]his gun's loaded," asked Joseph
if he wanted to die, and announced that he was going to
"shoot [Joseph] in the brain."

At 11:23:42 a.m., a female voice over the police radio
stated, "[H]e's saying open your mouth to the 12-year-old."
Sergeant Smith asked the HPD dispatcher to talk to Bourne

and see if he would roll down the window, but the dispatcher did not communicate that request to Bourne.

At 11:24:31 a.m., Sergeant Smith told Officer James Pendleton to "[t]ake the shot if you have it."

At 11:24:36 a.m., Officer Pendleton fired a single gunshot that killed Bourne.

Two seconds later, at 11:24:38 a.m., the other HPD officers fired at the vehicle, during which Sergeant Smith repeatedly yelled "[s]top" and "ceasefire." It was this second round of shots that killed Joseph.

B.

In October 2022, Plaintiffs filed a federal complaint, alleging several constitutional violations under 42 U.S.C. § 1983 and several state law claims. In September 2023, the district court dismissed Plaintiffs' federal claims with leave to amend. In January 2024, Plaintiffs filed a First Amended Complaint, alleging a Fourth Amendment excessive force claim under 42 U.S.C. § 1983; a Fourteenth Amendment substantive due process claim under 42 U.S.C. § 1983; a *Monell* claim based on a failure-to-train theory; and several state law claims.

In September 2024, the district court dismissed Plaintiffs' federal claims with prejudice and dismissed the state law claims without prejudice to reasserting them in state court. As to the Fourth Amendment excessive force claim, the district court determined that Plaintiffs had not plausibly alleged a constitutional violation because: (1) the HPD officers did not seize Joseph at any point, as he was Bourne's hostage; (2) Sergeant Smith did not seize Joseph when she ordered him to put his hands up; and (3) the HPD officers did not seize Joseph when they fired at Bourne and

unintentionally shot Joseph. The district court also "rejected
[Plaintiffs'] theory that Joseph went from being a hostage to
a passenger in the two seconds between Pendleton's initial
shot and the volley of shots from the other officers."
Alternatively, the district court determined that even if
Joseph were seized, "[t]he unsettled nature of the law on
seizures in hostage-taking cases . . . demonstrates that the
law is not so clearly established that every reasonable
official in these officers' shoes would know their conduct
violated the Fourth Amendment."

As to the Fourteenth Amendment substantive due
process claim, the district court determined that:
(1) Plaintiffs had not plausibly alleged a constitutional
violation because no facts suggest that the HPD officers
acted with an intent to harm Joseph unrelated to legitimate
law enforcement objectives; and (2) even if the HPD officers
acted with deliberate indifference, they are entitled to
qualified immunity. The district court dismissed Plaintiffs'
*Monell* claim because Plaintiffs had failed to plausibly allege
any constitutional violation. Plaintiffs timely appealed.

## II.

We have jurisdiction under 28 U.S.C. § 1291. We review
de novo a district court's dismissal of a complaint for failure
to state a claim, a district court's decision on qualified
immunity, and a district court's decision on *Monell* liability.
*Benavidez v. County of San Diego*, 993 F.3d 1134, 1141 (9th
Cir. 2021).

## III.

"The doctrine of qualified immunity shields officers
from civil liability so long as their conduct 'does not violate
clearly established statutory or constitutional rights of which

a reasonable person would have known.'" *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021) (per curiam) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "To determine whether qualified immunity applies in a given case, we must determine: (1) whether a public official has violated a plaintiff's constitutionally protected right; and (2) whether the particular right that the official has violated was clearly established at the time of the violation." *Shafer v. County of Santa Barbara*, 868 F.3d 1110, 1115 (9th Cir. 2017). "[B]oth prongs must be satisfied for a plaintiff to overcome a qualified immunity defense." *Id.*

A.

1.

We first consider whether the HPD officers violated Joseph's Fourth Amendment right to be free of excessive force. "Excessive force claims require (1) a seizure and (2) excessive force." *Cuevas v. City of Tulare*, 107 F.4th 894, 898 (9th Cir. 2024). A police officer can seize a person either through a show of authority that in some way restrains the person's liberty or by using force to apprehend the person. *Id.* at 899. Plaintiffs argue that they have plausibly alleged Joseph was seized: (1) when the HPD officers surrounded the Escalade and blocked the parking lot exits with their vehicles; (2) when Sergeant Smith ordered Bourne and Joseph to raise their hands; and (3) when the HPD officers shot Joseph. For the reasons explained below, we conclude that officers do not seize an individual for Fourth Amendment purposes when they employ control tactics or force in an attempt to rescue him from an active hostage situation. Under the circumstances of this case, there therefore was no seizure.

The Supreme Court has explained that the hallmark of a seizure is "actual submission." *Brendlin v. California*, 551 U.S. 249, 254 (2007). "[A] seizure by acquisition of control involves either voluntary submission to a show of authority or the termination of freedom of movement," and requires that "'a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result.'" *Torres v. Madrid*, 592 U.S. 306, 322 (2021) (quoting *Brower v. County of Inyo*, 489 U.S. 593, 599 (1989)).

Plaintiffs analogize the events of this case to the context of a traffic stop. During a traffic stop, passengers are seized along with the driver even if they are not the target of the stop because a "passenger will expect to be subject to some scrutiny, and his attempt to leave the scene would be so obviously likely to prompt an objection from the officer that no passenger would feel free to leave in the first place." *Brendlin*, 551 U.S. at 257. The question during such a stop is "whether a reasonable person in [the passenger's] position when the car stopped would have believed himself free to 'terminate the encounter' between the police and himself." *Id.* at 256–57 (quoting *Florida v. Bostick*, 501 U.S. 429, 436 (1991)).

Plaintiffs argue that, as during a traffic stop, Joseph would not have felt free to leave without the permission of the HPD officers. They point out that the officers had their weapons drawn and had instructed both Joseph and Bourne to put their hands up and exit the vehicle. They argue that Joseph would not have felt at liberty to disobey these instructions. Missing in this argument, however, is a "view of all of the circumstances surrounding the incident." *Id.* at 255 (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (principal opinion)). There is no doubt that a reasonable person in Joseph's position would not have

believed himself free to terminate the encounter. But this was due to the hostage-taker, Bourne's, actions, not the HPD officers' conduct.

Unlike the passenger of a car during a traffic stop, who can submit to police officers by obeying their instructions or otherwise indicating assent to their control, *see id.* at 262, a hostage under a hostage-taker's active control has no effective way to signal submission to the police. Here, Joseph was never able to submit to the HPD officers. Although Joseph raised his hands in response to Sergeant Smith's commands, and officers had their guns drawn at the vehicle, Bourne was at that moment still continuing to point a gun at Joseph and threatening to kill him. Joseph's freedom of movement was constrained not by the HPD officers' actions outside the Escalade, but by Bourne holding him hostage. We decline to establish a rule that, for Fourth Amendment purposes, a hostage may at once demonstrate submission to police and remain under the control of a hostage-taker. Such a rule does not fit with *Brendlin*'s requirement of "actual submission" to law enforcement. *Id.* at 254.

Plaintiffs' arguments also overlook the reality that the entire sequence of events surrounding Joseph's death was initiated by Bourne and not by the HPD officers. *See Torres*, 592 U.S. at 322. The facts Plaintiffs reference to establish a seizure—that officers had encircled the vehicle, blocked the roads leading into the parking lot, and pointed their guns at Bourne and Joseph—came about precisely because Bourne had taken Joseph hostage. Bourne operated as the "instrumentality" that set the events into motion. *See id.* (quoting *Brower*, 489 U.S. at 599).

Joseph was also not seized by the HPD officers when they used force to shoot him. While "an officer seizes a person when he uses force to apprehend her," neither "[a]ccidental force" nor "force intentionally applied for some other purpose" constitutes a seizure. *Id.* at 309, 317. A "seizure requires the use of force *with intent to restrain*." *Id.* at 317 (emphasis in original). That intent was lacking here.

Plaintiffs emphasize that the HPD officers intended to shoot the Escalade while knowing that Joseph was inside the vehicle. It is true that, in *Villanueva v. California*, we determined that because a passenger's "freedom of movement was terminated when the Officers intentionally shot at the [vehicle] in which he was a passenger to stop its movement, [the passenger] was seized within the meaning of the Fourth Amendment." 986 F.3d 1158, 1168 (9th Cir. 2021). We explained that "[i]t matters not whether the Officers intended to shoot [the passenger] or whether they even knew he was present as a passenger." *Id.* Our holding in *Villanueva*, however, distinguished several out-of-circuit decisions that "address the very different situation where the passenger was also a hostage and the officers were trying to rescue the passenger, not arrest him." *Id.* at 1167.[4] Here, the HPD officers were attempting to rescue Joseph from a hostage situation at the time of the shooting. Far from "objectively manifest[ing] an intent to restrain" him as *Torres* requires, 592 U.S. at 317, they were attempting to save his life. *Cf. Villanueva*, 986 F.3d at 1165–69.

The conclusions reached above hold true even considering that Bourne was shot and incapacitated two

---

[4] *See, e.g.*, *Childress v. City of Arapaho*, 210 F.3d 1154, 1157 (10th Cir. 2000); *Medeiros v. O'Connell*, 150 F.3d 164, 168 (2d Cir. 1998); *Landol-Rivera v. Cruz Cosme*, 906 F.2d 791, 795 (1st Cir. 1990).

seconds before the volley of shots that killed Joseph. We do not go so far as to conclude that a separate causal chain of events could not give rise to a Fourth Amendment claim after a hostage-taker has been incapacitated. But we do conclude that, as a matter of law, a two-second window is insufficient to transform a situation from one initiated and controlled by a hostage-taker to one initiated and controlled by police.

2.

Even had Plaintiffs plausibly alleged a constitutional violation, the HPD officers would be entitled to qualified immunity because Joseph's right to be free of excessive force during an active hostage situation was not clearly established at the time of the violation.

For a right to be clearly established, it must be "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). "This demanding standard protects 'all but the plainly incompetent or those who knowingly violate the law.'" *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). There does not need to be "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix*, 577 U.S. at 12 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)); *see also Wesby*, 583 U.S. at 63 ("The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply."). The plaintiff "bears the burden of showing that the rights allegedly violated were 'clearly established.'" *Shafer*, 868 F.3d at

1118 (quoting *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1157 (9th Cir. 2000)).

Plaintiffs argue that the HPD officers are not entitled to qualified immunity because "it is well established that the police may not simply shoot innocent individuals." But this is too general a proposition. The Supreme Court has "repeatedly stressed that courts must not 'define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.'" *Wesby*, 583 U.S. at 63–64 (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)). "[T]he clearly established law must be 'particularized' to the facts of the case." *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

Here, Plaintiffs have not cited any decision addressing the right to be free of excessive force in a hostage situation, much less establishing that it is possible for police to conduct a seizure in a two-second window between the time a hostage-taker is incapacitated and the time of the hostage's own death. Nor have we identified any analogous cases. Plaintiffs have therefore failed to plausibly allege that Joseph's Fourth Amendment right to be free of excessive force was clearly established at the time of the alleged violation.

## B.

### 1.

We next consider whether the HPD officers violated Iehab's "Fourteenth Amendment liberty interest in the companionship and society" of his son. *Wilkinson v. Torres*,

18          HAWATMEH V. CITYOF HENDERSON

610 F.3d 546, 554 (9th Cir. 2010). We conclude that they did
not.

We have recognized that "[o]fficial conduct that 'shocks
the conscience' in depriving parents of [this Fourteenth
Amendment liberty] interest is cognizable as a violation of
due process." *Id.* (quoting *Porter v. Osborn*, 546 F.3d 1131,
1137 (9th Cir. 2008)). "Where actual deliberation is
practical, then an officer's 'deliberate indifference' may
suffice to shock the conscience." *Id.* (quoting *Porter*, 546
F.3d at 1137). But where "a law enforcement officer makes
a snap judgment because of an escalating situation, his
conduct may only be found to shock the conscience if he acts
with a purpose to harm unrelated to legitimate law
enforcement objectives." *Id.*

Plaintiffs argue that the deliberate indifference test
should apply because the HPD officers had enough time to
deliberate before shooting Bourne and Joseph. But
Plaintiffs' factual allegations demonstrate that the hostage
situation was "in constant flux." *Porter*, 546 F.3d at 1140.
By the time Bourne and Joseph were inside the Escalade,
Bourne had already forced his way into an apartment and
shot three people, one of whom, like Joseph, was just a child.
While on the phone with the HPD dispatcher, Bourne
repeatedly threatened to kill Joseph and indicated more than
once that he had not taken his medications. Sergeant Smith
saw Bourne holding a gun. The HPD officers were told that
Bourne was "saying that [he] will kill" Joseph, who they
knew to be a 12-year-old child. That the officers shot Bourne
and Joseph less than a minute after hearing that Bourne told
Joseph to "open your mouth" underscores that they were
forced to make "a split-second decision" in a rapidly
evolving situation. *See Wilkinson*, 610 F.3d at 554. And no
factual allegation indicates that the officers had anything but

legitimate law enforcement objectives in mind when they fired their guns. Plaintiffs do not argue that the officers intended to do Joseph harm.

Again, our conclusion does not foreclose the possibility that other hostage situations may give rise to Fourteenth Amendment liberty concerns if police conduct manifests the type of "shocking" deliberate indifference that is constitutionally actionable. *See Porter*, 546 F.3d at 1139 (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 853 (1998)). But there was no such egregious conduct here and hence there was no Fourteenth Amendment violation.

2.

Even had the HPD officers acted with deliberate indifference, they would be entitled to qualified immunity.

Plaintiffs argue that the district court's qualified immunity determination was "erroneous" because the HPD officers "shot Joseph at a time when he was no longer a hostage and when he was simply an unarmed citizen who presented no danger whatsoever to either them or the public." But Plaintiffs cite no case law in support of their argument. And, as discussed above, there are in fact no cases addressing hostage situations like that presented in this case. As such, Plaintiffs have failed to plausibly allege that Iehab's Fourteenth Amendment right was clearly established at the time of the alleged violation.

IV.

Plaintiffs' *Monell* claim fails in the absence of any plausible allegation of a constitutional violation. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the

departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point."); *see also Benavidez*, 993 F.3d at 1153–54 (requiring a plaintiff to "include sufficient facts to support a reasonable inference . . . of a constitutional violation" to support a failure-to-train *Monell* theory).

V.

For the reasons discussed above, Plaintiffs have failed to plausibly allege any violation of their constitutional rights by the HPD officers or that their rights were clearly established at the time of the alleged violations. The district court's judgment is therefore **AFFIRMED**.